[No. 9318.    Department One.    April 10, 1911.]

I. B. WINSOR, *Plaintiff and Appellant*, v. COMMONWEALTH COAL COMPANY *et al., Defendants and Respondents*, R. L. McCORMICK *et al., Defendants and Appellants.*[1]

ATTORNEY AND CLIENT—DEALINGS BETWEEN—FRAUD—EVIDENCE—SUFFICIENCY. The evidence sustains findings that attorneys did not overreach a client in entering into a contract whereby half of his stock in a mining corporation was turned over to the attorneys in consideration of their raising the funds to pay off the indebtedness and finance the concern, the other half of his stock to be held under a pooling agreement, where the client owned the majority of the stock, the concern was in the hands of a receiver, there was no market for the stock and no other way to pay off the indebtedness, and the client made the proposition with full knowledge of the facts and was fully competent to attend to business.

[1]Reported in 114 Pac. 908.

CORPORATIONS—MANAGEMENT—EMPLOYMENT OF STOCKHOLDER—DIS-
CHARGE. A stockholder transferring stock in consideration of an
agreement that he be employed as sales agent may be discharged
from such position for inefficiency.

USURY—WHO MAY RAISE OBJECTION. The objection that the giv-
ing of stock to persons who advanced money for loans to the corpo-
ration amounted to usury cannot be urged by a person who was not
interested in the transaction or stock.

CORPORATIONS—MANAGEMENT—POOLING STOCK—VALIDITY OF CON-
TRACT—PUBLIC POLICY. A pooling contract for the voting of corpo-
rate stock is not void as against public policy, because of provisions
in the agreement relating to the employment of an agent and the
election of a director, where there was no fraud and nothing un-
lawful about it and nothing which necessarily affected the rights
of minority stockholders.

Cross-appeals from a judgment of the superior court for
Pierce county, Shackleford, J., entered August 8, 1910, in
favor of certain defendants, after a trial on the merits be-
fore the court without a jury, in an action on contract. Mod-
ified.

*Sullivan & Christian, Gordon & Askern*, and *Higgins, Hall
& Halverstadt*, for plaintiff I. B. Winsor and defendant
Richard Winsor.

*Jas. F. McElroy, Hayden & Langhorne*, and *Bates, Peer
& Peterson*, for defendants McMurray, McCormick and Stev-
enson.

MOUNT, J.—The plaintiff brought this action to annul a
contract entered into by himself and Newton H. Peer, and to
annul all contracts made by Bates, Peer & Peterson pursuant
to the original contract, upon the ground that Bates, Peer
& Peterson were attorneys for the plaintiff at the time the
original contract was made, and that they overreached the
plaintiff, and that after they and their associates had obtained
possession of the property described in the contract, they mis-
managed the same so that it was in imminent danger of be-
ing wholly lost. The defendants admitted the contract, but
denied all the allegations upon which an annulment was based.

Upon a trial of the case, the court concluded that Bates, Peer & Peterson, at the time the contract was made, were attorneys and confidential advisers of the plaintiff, and "the contract being in effect between attorneys and their clients, the burden rests upon the attorneys to show the fairness of the agreement," and "the evidence shows that the amount of compensation provided for in the agreement was just, fair and proper, and it was the purpose of the attorneys in making the contract to deal fairly with their client." The court also found that the attorneys had fully executed the agreement, and that the provisions in the contract relating to the retention of the plaintiff as a trustee of the corporation, and in regard to the employment of the plaintiff as a sales agent, were against public policy and void; and for that reason concluded that the plaintiff had a right to rescind the provisions of the contract relating to the pooling of plaintiff's stock. A decree was thereupon entered, to the effect that defendants Bates, Peer & Peterson and their associates retain 355,000 shares of the stock of the Commonwealth Coal Company, and that new certificates for 336,589 shares be made out in the name of the plaintiff and deposited with the defendant Scandinavian American Bank, to be held by it under an agreement for collateral security for a debt owing to the bank, and secondarily to secure a claim of defendant Richard Winsor; also that, out of the stock adjudged to defendants Bates, Peer & Peterson and their associates, 18,411 shares be held subject to the claim of said Richard Winsor, and that the pooling agreement be adjudged void, in so far as it affected the stock awarded to plaintiff as above stated. The plaintiff has appealed from that part of the decree denying the relief prayed for, and the defendants McCormick, McMurray and Stevenson have appealed from that part of the decree rescinding the pooling agreement.

The record of the case is very voluminous, but the salient facts are briefly stated as follows: It appears that, prior to December, 1909, the plaintiff owned the majority of the cap-

ital stock of the Commonwealth Coal Company, a corpora-
tion organized under the laws of this state. This corpora-
tion was engaged in operating coal mines. The defendants
C. O. Bates, N. H. Peer and C. T. Peterson had been retained
as attorneys for the Commonwealth Coal Company, and had
frequently advised the plaintiff in regard to the business of
this and other corporations in which the plaintiff was inter-
ested. In the summer of 1909, the Commonwealth Coal Com-
pany became embarrassed financially, and was unable to meet
its maturing obligations. The plaintiff had unsuccessfully
endeavored to dispose of his personal stock in order to raise
funds with which to carry on the business of the corporation.
The plaintiff owned 710,000 shares of the capital stock of
the Commonwealth Coal Company, capitalized for 1,000,000
shares. This company, on December 8, 1909, was in the
hands of a receiver because of its inability to meet its monthly
pay roll. On that date the plaintiff entered into an option
contract, by which he agreed to sell 510,000 shares of his
stock in the Commonwealth Coal Company to one A. C. Mar-
connier, in consideration that the latter would pay $43,000
indebtedness of said company. This contract was to be ac-
cepted by ten o'clock the next morning. It was not so ac-
cepted. Whether Marconnier changed his mind, or whether
plaintiff changed his mind, is not clear. At any rate the con-
tract was not carried out. Thereupon the plaintiff solicited
his attorneys, Bates, Peer & Peterson, to assist him to finance
the company, in order to get the same out of the hands of the
receiver. After some negotiations, the contract in question
was entered into as follows:

"Memorandum of Agreement, made and entered into this
11th day of December, A. D. 1909, by and between I. B. Win-
sor, party of the first part, and Newton H. Peer as trustee,
party of the second part:

"Witnesseth: That whereas the party of the first part is
the owner of seven hundred ten thousand (710,000) shares
of the capital stock of the Commonwealth Coal Company, a

3—63 WASH.

corporation duly organized and existing under and by virtue of the laws of the state of Washington of the par value of one dollar ($1) a share;

"And whereas the said I. B. Winsor is president of said Commonwealth Coal Company, and whereas the said Commonwealth Coal Company is indebted to divers and sundry persons in the sum of approximately forty-five thousand dollars ($45,000) of which sum about five thousand dollars ($5,000) is for the October pay roll of said corporation, which is now past due, and for which a lien has been filed; and whereas there will be due to the laborers in the mines of said corporation the November pay roll amounting to about eight thousand dollars ($8,000) on the 20th day of December, A. D. 1909; and whereas the said Commonwealth Coal Company and the party of the first part are without funds with which to liquidate said amounts due on said payrolls and the other indebtedness;

"And whereas they are desirous of obtaining the necessary funds to liquidate said indebtedness, and whereas the said party of the first part is the owner of more than a majority of the capital stock in said Commonwealth Coal Company, and whereas most of the capital stock of said Commonwealth Coal Company owned by the party of the first part is now hypothecated with the creditors of said company, as security for the payment of said indebtedness.

"Now, therefore, it is mutually understood and agreed between the parties hereto, as follows: The party of the first part, in consideration of the covenants and agreement hereinafter set forth to be performed on the part of the party of the second part, agrees as follows: That he will and does hereby transfer and set over unto the party of the second part three hundred fifty-five thousand (355,000) shares of the capital stock of the Commonwealth Coal Company, to be held and owned by the said party of the second part; and that he will deposit the balance of said capital stock owned by him, to wit, three hundred fifty-five thousand (355,000) shares, with the party of the second part, to be pooled by the party of the second part with the stock owned by him, under a pooling agreement that the party of the second part shall vote at all stockholders' meetings all of said stock, to wit, three hundred fifty-five thousand (355,000) shares, owned by the said I. B. Winsor, either in the election of a board of trustees

or officers or for any other purpose for which said stock shall be voted, it being distinctly understood and agreed, however, that the title to the said three hundred fifty-five thousand (355,000) shares, so deposited with the party of the second part by the party of the first part under said pooling agreement, shall be and remain in the party of the first part, subject only to the terms of said pooling agreement. It is further understood and agreed that all of said stock be transferred to the party of the second part under the terms of this agreement subject only to the rights of the party with whom said stock is now hypothecated. And the said party of the second part, for and in consideration of the covenants and agreements to be performed by said party of the first part as herein set forth, agrees to at once advance to the Commonwealth Coal Company sufficient money to pay the October payroll of the Commonwealth Coal Company, and also on or about the 20th day of December, A. D. 1909, advance to said Commonwealth Coal Company, sufficient money to pay the November payroll of said Commonwealth Coal Company, or so much thereof as may be necessary to take care of said November payroll. The said party of the second part further agrees to advance at once any further sum necessary, not exceeding the sum of thirty-five hundred dollars ($3,500), to pay and take care of any floating indebtedness or liability of said Commonwealth Coal Company that it is necessary to pay at this time. It is further understood and agreed that the said I. B. Winsor shall resign his office as president of said Commonwealth Coal Company, and the vacancy caused by said resignation shall be filled by some party that is elected by the party of the second part or his associates, provided however, that the said I. B. Winsor shall be retained on said board of trustees and shall be retained on said board of trustees during the continuance of this agreement. It is further understood and agreed that as soon as practicable the mines of the Commonwealth Coal Company shall be opened and put in active operation and the profits derived from the sale of the product of said mine, after paying all running expenses and fixed charges and such betterments as the board of trustees of said Commonwealth Coal Company shall direct, shall be applied to the payment of the said indebtedness owing by the Commonwealth Coal Company in such manner and in such a way as the board of trustees may designate. It is further understood and agreed that the

said I. B. Winsor shall be appointed salesman of the produce of said mine. It is further understood and agreed that the party of the first part shall obtain the resignation of the following named trustees of said Commonwealth Coal Company: George H. Tarbell, John W. Phillips, W. H. Pringle, and Corwin S. Shank, or any three of the same, and the vacancies caused thereby shall be filled by the said party of the second part or his associates.                    I. B. Winsor

                    "Newton H. Peer, as Trustee."

This contract was, in fact, the contract of Winsor and Bates, Peer & Peterson. It was dictated in the presence of the plaintiff, and contained the offers made by the plaintiff to his attorneys at the time it was made. It was not signed until the 13th or 14th of December. At the time this contract was entered into, the corporation was in the hands of a receiver, and all of the stock mentioned was held by the Scandinavian American Bank as collateral security for debts owing to the bank by the coal company and by the plaintiff. The plaintiff thereupon gave to Peer an order on the bank for the stock mentioned in the contract. It was estimated by the parties to the contract that $30,000 would be sufficient to pay off the pressing debts and take the company out of the hands of the receiver. Bates, Peer & Peterson thereupon solicited certain of their friends to loan money to the Commonwealth Company, promising them that the money would be repaid within a few months; and as an inducement to them to make the loan, promised that all the stock should be placed in a pool for ten years in order that they might control the company, and that persons loaning money should share in the stock given to Bates, Peer & Peterson by the contract. Under these promises the defendants loaned money to the coal company, and advanced the same to Mr. Peterson as follows: R. L. McCormick, $8,000; J. L. McMurray, $15,000; N. H. Peer, $2,250; C. T. Peterson, $2,250; George Stevenson, $2,250; making a total of $29,750. Mr. Peterson took this money and, in company with the plaintiff, went to the mine, where $17,068.79

was used in paying labor claims for the mining company. The balance was turned over to the treasurer of the company.

At the time these labor claims were paid, Mr. Peterson had no security from the company for this money. He thereupon had the claimants assign their claims to him, the plaintiff being present and assisting in making the payments and in taking these assignments. The receiver was subsequently discharged, and the new stockholders proceeded to reorganize the company by electing themselves and the plaintiff directors thereof. Upon this being done, application was made to the Scandinavian American Bank to release the capital stock held as collateral security as above stated. A new contract was then entered into by the bank and the coal company, acting through its new officers, by which contract a part of the debt owing to the bank was paid and time was given upon the remainder. The bank, however, upon being informed that the plaintiff, I. B. Winsor, was retained upon the board of directors, refused to execute the new contract or release any of the stock held by it, until the plaintiff was without authority in the management of the company. The plaintiff thereupon agreed to retire from the board of directors temporarily until the debt owing to the bank was paid, but that such retirement should not alter the other terms of the contract with Mr. Peer—the contract in question. Thereupon the bank released 475,589 shares of stock, the greater part of which it was agreed by the contract should belong to Bates, Peer & Peterson. Two hundred thousand of these shares were then divided between all the parties who had advanced money, according to the amount each one had advanced, and upon a basis of sixteen cents per share. It was soon necessary for the company to have more money, and $15,000 more was loaned to the company by the same parties who had advanced the $29,750, as above stated.. These parties thereupon insisted that Bates, Peer & Peterson should, on account of this new loan, divide the 355,000 shares held by them. They thereupon consented, and taking one-half thereof to themselves, divided the other

half among the parties who had advanced the last loan, according to the amount advanced by each. Thereafter the plaintiff, who had been employed as sales agent for the company, was discharged for inefficiency. Subsequently interest on the bonded indebtedness of the mine became due and was not paid, but so far as disclosed by the record, no foreclosure proceedings were instituted.

It is conceded that the defendant Richard Winsor has a secondary lien for about $40,000 on the stock held by the bank. There is no evidence that the coal company had been improperly managed by the new board of directors. The whole record shows, that the plaintiff was fully advised and knew of all the conditions of the contract which he seeks to have declared void; that he was fully informed and knew what Bates, Peer & Peterson were doing with the stock. We find nothing worthy of notice to the effect that Bates, Peer & Peterson overreached the plaintiff, or of any bad faith on their part. On the other hand, the great weight of the evidence shows that they did what the plaintiff desired them to do, and at all times kept faith with the plaintiff. It was specifically agreed that they should have 355,000 shares, to be held and owned by them for their work. It is extremely doubtful if this stock at that time had any real value. It is true that Bates, Peer & Peterson divided this stock among the persons loaning the money, at the rate of sixteen cents per share, but there was no market for it at that time at such price, or at any other price, and there is no evidence in the record as to the value after that time. It is true there is a statement of assets and liabilities of the Commonwealth Coal Company which shows assets largely in excess of the liabilities, but there is nothing to show that this statement is correct, or even approximately so, in regard to the assets. But if the stock was valuable, the plaintiff knew that fact much better than any one else, and it was his proposition to give that stock to his attorneys as compensation for their work. There was some effort made to show that the plaintiff was worried and thereby

unfit to attend to business transactions. He was no doubt worried, but he was fully competent to attend to his business, and knew his business at all times, and particularly when he entered into the contract in question.

It is argued by the plaintiff that the contract contained illegal provisions and was therefore void, as follows:

"(1) That Peer as part consideration for the transfer should vote the plaintiff's stock; (2) that plaintiff should be retained on the board of trustees during the life of the agreement; (3) that the plaintiff should be appointed salesman of the produce of the mine; (4) that plaintiff should secure the resignation of three of the trustees and the vacancies be filled by Peer and his associates."

The first and fourth provisions named above were for the benefit of the persons whom Bates, Peer & Peterson should interest in the company, and the second and third provisions were for the benefit of the plaintiff. We know of no rule of law which prevents one person from authorizing another to vote his stock. The code provides that this may be done. Rem. & Bal. Code, § 3686. The plaintiff himself, after the contract had been executed and before the action was brought, expressly waived his right to be retained on the board of trustees. The plaintiff was appointed as sales agent, and served in that capacity for several months, and until he became inefficient; and he certainly was liable to be discharged for such cause. The vacancies were made on the board of directors. Even if the contract was illegal and therefore might not have been enforced in the particulars named, the provisions for the benefit of the plaintiff were actually performed or waived. The plaintiff, therefore, has no cause for complaint upon that account.

The plaintiff also argues that the giving of the stock by Bates, Peer & Peterson to the parties who advanced the money for the loans constituted usury. We think there was no usury in this. The stock given out actually belonged to Bates, Peer & Peterson at the time. They certainly could

dispose of it as they saw fit. But if the giving out of this stock by Bates, Peer & Peterson did constitute usury, the plaintiff may not urge that question in this case, for he is not interested. We think the record shows that the contract sought to be avoided was fairly entered into, and was executed by the defendants Bates, Peer & Peterson in good faith.

This contract, in regard to pooling the stock, is as follows:

"That he [plaintiff] will deposit the balance of said capital stock owned by him, to wit, three hundred fifty-five thousand (355,000) shares, with the party of the second part, to be pooled by the party of the second part with the stock owned by him, under a pooling agreement that the party of the second part shall vote at all stockholders' meetings all of said stock, to wit, three hundred fifty-five thousand (355,000) shares, owned by the said I. B. Winsor, either in the election of a board of trustees, or officers, or for any other purpose for which said stock shall be voted."

The trial court rescinded this provision of the contract, upon the ground that the two provisions relating to the retention of the plaintiff as a member of the board of trustees and his employment as sales agent were against public policy. If these provisions were against public policy, it does not necessarily follow that the pooling agreement was also void or against public policy. This pooling agreement was made by the plaintiff, who at that time owned a majority of all the stock of the corporation. He made it for his own protection, and also for the protection of those who might thereafter acquire stock. Under this provision of the contract, the defendants Bates, Peer & Peterson, with the knowledge and acquiescence of the plaintiff, entered into a ten-year pooling agreement with minority stockholders, who acquired stock upon the assurance that the stock should remain in the pool and not be offered for sale except to each other for that length of time, and that the plaintiff's stock should be voted by Mr. Peer. There appears to be nothing unfair or fraudulent in this agreement. Bates, Peer & Peterson acquired their stock under this agreement, and the defendants McCormick, Mc-

Murray and Stevenson acquired stock from Bates, Peer & Peterson, relying upon this provision of the contract. In fact, their testimony shows that, without such agreement, they would neither have loaned their money nor accepted the stock. It is therefore apparent that this provision of the contract should not now be rescinded, unless it is contrary to public policy or in some way tainted with fraud. The agreement to pool the stock was not against public policy, because there was nothing unlawful about it and nothing which necessarily affected the rights of minority stockholders. Persons owning stock have the unqualified right to combine their interests to secure the management of the corporation when such management is fair to all stockholders alike. *Faulds v. Yates*, 57 Ill. 416, 11 Am. Rep. 24; *Smith v. San Francisco & N. P. R. Co.*, 115 Cal. 584, 47 Pac. 582, 56 Am. St. 119, 35 L. R. A. 309; *Weber v. Della Mountain Min. Co.*, 14 Idaho 404, 94 Pac. 441; *Chapman v. Bates*, 61 N. J. Eq. 658, 47 Atl. 638. If this agreement had been made for the purpose of depriving some stockholder of his rights in the company, or of doing some other illegal act, a different rule would apply. But this contract seems to have been entered into for legal purposes and in good faith, and has been acted upon. The plaintiff is not now in a position to seek its rescission.

The judgment of the lower court is therefore modified, in so far as it rescinds the provision relating to the pooling agreement, but in all other respects it is affirmed; defendants to recover costs.

DUNBAR, C. J., PARKER, FULLERTON, and GOSE, JJ., concur.