[No. 14119.   Department One.   September 4, 1917.]

WALTER G. CLARK, *Appellant*, v. ROBERT A. FOSTER *et al.*,
*Respondents.*[1]

CORPORATIONS—STOCK—VOTING TRUST—CONTRACT—PUBLIC POLICY.
A voting trust agreement is not void as against public policy where
it was made in good faith for the advantage of the corporation and
all the stockholders to protect security for a period of twenty years.

SAME—STOCK—VOTING TRUSTS—VALIDITY—STATUTES.   A voting
trust agreement does not contravene Rem. Code, § 3686, providing
that trustees shall be "actually" elected by the stockholders, in the
absence of fraud or any unlawful purpose.

SAME—STOCK—VOTING TRUSTS—CONSIDERATION.   A voting trust
agreement voluntarily created as a condition precedent to a loan to
protect money advanced to save the life of the corporation is based
upon a sufficient consideration.

Appeal from a judgment of the superior court for Asotin
county, Miller, J., entered October 16, 1916, dismissing an
action for equitable relief, after a trial on the merits before
the court.   Affirmed.

*Will H. Fouts, Ernest W. Hardy,* and *Robert H. McGrath,*
for appellant.

*Eugene A. Cox, James E. Babb, B. S. Grosscup,* and
*Arthur H. Morse,* for respondents.

CHADWICK, J.—The Lewiston-Clarkston Company, a
Washington corporation, was in need of new organization and
new credit.   In addition to the lands owned by it and which
it holds with water rights, it had acquired by purchase and
developed a small hydro-electric plant.   In the year 1910,
the company was reorganized under the name of the Lewis-
ton-Clarkston Improvement Company.   It is unnecessary to
inquire further into the reasons for the reorganization.   They
are not now material.

[1] Reported in 167 Pac. 908.

The plaintiff in this case, an attorney at law residing in the city of New York and intimate with large financial affairs, was one of the active agents in the new organization, and, for his services, was given 2,012 shares of its common stock. To which holding he has since added by purchase 1,761 shares.

The capital stock of the new company was fixed at 24,000 shares of the par value of one hundred dollars each. Twelve thousand shares of the stock was made preferred stock and twelve thousand common stock. The preferred stock was made nonvoting, except to subject the property to an indebtedness exceeding the sum of eight hundred thousand dollars. The preferred stock does not figure in this case and will not be further referred to. The common stock was all issued. To further the interests of the corporation, as the parties then supposed, the holders of 9,453 shares of the common stock, the plaintiff among them, entered into what is called a "voting trust agreement."

This agreement is too long to be quoted, and from the view we take of this case, it is probably unnecessary to say more than by its terms certain trustees were named to receive the stock. The shares were to be held by the trustees and voted at any and all regular and special meetings of the stockholders of the company, with full power and authority to sign, execute and deliver all consents in respect to the stock as in their sole judgment they might deem for the best interests of the company and its stockholders. The life of the agreement was to continue until March 1, 1930, unless the preferred stock was all redeemed and the bonded indebtedness paid prior to that time. It was provided that the voting trust agreement might be dissolved at any time by the unanimous vote of the depositors. In the preamble of the agreement it was recited:

"Whereas, the purchasers of the entire outstanding issue of said bonds, to wit, six hundred thousand dollars in par value thereof, have requested the execution and delivery of

this agreement by the holders of a majority of the common stock of the company, in part consideration for their purchase of said bonds; and

"Whereas, in further consideration for their purchase of said bonds there has also been sold to the bondholders a certain portion, to wit, a minority interest in the common stock of the company, and the holders of the remainder of said common stock, whether as holders of the outstanding preferred stock of the company or otherwise, have been and will be largely benefited by the purchase of said bonds; and

"Whereas, the depositors, with a view of securing united action and of promoting the best interests of themselves and of all other holders of the common stock of the Lewiston-Clarkston Improvement Company who may join in this agreement, and for the better protection of the bondholders and minority stockholders before mentioned, desire to transfer their stock to the trustees for the purpose of vesting in them the right to vote thereon for the period and upon the terms and conditions hereinafter stated;"

At the time the contract was entered into, the trustees issued and delivered to the depositors a "voting trust certificate," made assignable, describing the number of shares deposited, and reciting that the holder was entitled to receive all dividends declared by the company.

In the fall of 1916, the trustees selected under the voting trust agreement entered into negotiations for the sale of the hydro-electric plant. The negotiations had so far proceeded that terms were agreed upon, but the sale had not been consummated. The plaintiff, disagreeing with the policy of the trustees, brought this action to restrain a meeting of the trustees and the contemplated sale. A preliminary restraining order was issued by the court. It was thereafter dissolved. The case went to a hearing on its merits, and from a decree denying plaintiff the relief sought, plaintiff has appealed.

The record is very voluminous and the briefs, which are exhaustive, have taken a wide range, but as we view the case, there are but two questions necessary to be considered. First,

whether a voting trust agreement is void as a matter of public policy; and second, if not void as offensive to public policy, is it violative of the spirit and letter of the statute law of this state providing for the creation and management of domestic corporations.

Whether a voting trust agreement is void as a matter of public policy is one upon which the courts have drawn many different conclusions. While it is stated broadly in many of the text books and annotated notes that the courts have held, on the one side, that such contracts are void as against public policy and other courts have held they are not invalid, we are of the opinion that in most, if not quite all, of the cases to which our attention has been called the courts have, notwithstanding certain broad statements, inclined to look to the facts and equities of the particular case. As, for instance, where the duration of the trust agreement was fixed for a time unreasonably long, or without a definite period, or beyond the life of any of the participators, or where such agreements were made upon condition of an office to be granted, or for the sole benefit of the parties to the agreement and not for the general welfare of the corporation, or in fraud of, the rights of the corporation or the other stockholders, the contract has been held void.

On the contrary, it has been held, where an agreement is made in good faith and is for the betterment of the corporation and apparent advantage of all of the stockholders, or to protect the security which sustains the corporation, and it does not appear that any illegal advantage is sought and the agreement is freely and voluntarily entered into, such contracts are not, in and of themselves, contrary to public policy.

It would extend this opinion beyond legitimate bounds to assemble and discuss the many cases referred to by counsel. It is enough to say that this same question was before the court in *Winsor v. Commonwealth Coal Co.*, 63 Wash. 62, 114 Pac. 908, 33 L. R. A. (N. S.) 63. While the cases were

not discussed in the opinion, the authorities now submitted were, with one exception, cited in the briefs and considered by the court. In that case, this court upheld an agreement which, in its legal effect, is no more nor less than a voting trust. The court said on page 72:

"There appears to be nothing unfair or fraudulent in this agreement. Bates, Peer & Peterson acquired their stock under this agreement, and the defendants McCormick, McMurray and Stevenson acquired stock from Bates, Peer & Peterson, relying upon this provision of the contract. In fact, their testimony shows that, without such agreement, they would neither have loaned their money nor accepted the stock. It is therefore apparent that this provision of the contract should not now be rescinded, unless it is contrary to public policy or in some way tainted with fraud. The agreement to pool the stock was not against public policy, because there was nothing unlawful about it and nothing which necessarily affected the rights of minority stockholders. Persons owning stock have the unqualified right to combine their interests to secure the management of the corporation when such management is fair to all stockholders alike. *Faulds v. Yates*, 57 Ill. 416, 11 Am. Rep. 24; *Smith v. San Francisco & N. P. R. Co.*, 115 Cal. 584, 47 Pac. 582, 56 Am. St. 119, 35 L. R. A. 309; *Weber v. Della Mountain Min. Co.*, 14 Idaho 404, 94 Pac. 441; *Chapman v. Bates*, 61 N. J. Eq. 658, 47 Atl. 638. If this agreement had been made for the purpose of depriving some stockholder of his rights in the company, or of doing some other illegal act, a different rule would apply. But this contract seems to have been entered into for legal purposes and in good faith, and has been acted upon."

Counsel seeks to distinguish the *Winsor* case, but we think it cannot be distinguished when considered in the light of its own record. Here, as there, the object of the participators was lawful, and, as they believed, for the best interests of the company and for those who had furnished it funds to meet its pressing demands. Indeed, it might be said of the instant case that the voting trust was demanded by the bondholders, with whom the plaintiff was in intimate rela-

tion. The form of the contract was revised by him and made to conform to the demands of those whom he had been instrumental in inducing to invest in the corporate bonds. More than that, the plaintiff received $22,000 in money in addition to the 2,012 shares of common stock, as a consideration for services in attending to the reorganization. We are not suggesting these matters as grounds of estoppel, for, adhering to the *Winsor* case as we do, we deem it unnecessary to go that far, but we do suggest these things to show the lawful purpose and good intent of all the parties concerned, and the close parallel between the attending circumstances of the *Winsor* case and this case.

Therefore, without further discussion, and upon the authority of the *Winsor* case, which was reexamined in the case of *Gleason v. Earles*, 78 Wash. 491, 139 Pac. 213, 51 L. R. A. (N. S.) 785, with this verdict, "This case, we think, was rightly decided," we hold that the voting trust agreement is not void, in and of itself, on the ground of public policy.

But it is said that the trust agreement violates § 3686 of Rem. Code:

"The corporate powers of the corporation shall be exercised by a board of not less than two trustees who shall be stockholders in the company . . . and who shall, after the expiration of the term of the trustees first elected, be actually elected by the stockholders . . .; but all elections shall be by ballot, and each stockholder, either in person or by proxy, shall be entitled to as many votes as he shall own, or represent by proxy, shares of stock, and the person or persons receiving the greatest number of votes shall be trustee or trustees; Provided, that nothing herein contained shall prevent any corporation, by their by-laws, limiting such *bona fide* shareholder to a single vote, or one vote for every full share of paid-up stock, or its equivalent in assessable stock, disregarding the number of shares he may own."

Stress is laid upon the word "actually." It is contended that the legislature has provided a rule for the government of the internal affairs of corporations which may not be overcome by the contract of the parties, however lawful and how-

ever innocent it might otherwise be; that the vice of the agreement lies in the fact that the shareholder has given up something of which he cannot lawfully divest himself.

"The argument is that every stockholder must be free to cast his vote for what he deems the best interest of the corporation, the other stockholders being entitled to the benefit of such free exercise of his judgment by each; and hence any combination or device by which any number of stockholders combine to place the voting of their shares in the irrevocable power of another is contrary to public policy." 21 Ann. Cas. note on page 1298.

The logic of the cases being that the actual participation contemplated by the statute cannot be accomplished if the stockholders are permitted to surrender their discretion and will in so important a matter as that of voting for directors and become mere passive agents in the hands of those who may have no interest, legal or equitable, in the stock controlled by them.

The cases holding that a voting trust agreement does not contravene a statute providing for the voting of stock by the shareholder rest upon the principle enunciated by Justice Holmes when a member of the supreme bench of the state of Massachusetts. In *Brightman v. Bates*, 175 Mass. 105, 55 N. E. 809, the suggestion that a voting trust agreement providing that the trustees should vote the stock of the corporation at each annual meeting for a period of not less than three years would deprive the stockholders in advance of their power and duty as stockholders and submit them to the dictation of men who might then, or at some time in the future, have no interest in the corporation, was met in this way:

"The question before us is not whether it would be possible to carry out the contract in a way which would have made the contract bad if specified in it, but whether it was impossible to carry out the contract in a way which might lawfully have been specified in advance. We put the question in this form because there is no doubt that the sub-

scribers might actually have done the things stipulated without giving any one a right to complain. That is to say, they might have held their stock and voted by previous understanding according to the advice of the committee, as long as they chose. The question is what they might contract to do; for this is supposed to be a case where a contract to do lawful acts is unlawful. . . . A stockholder has a right to put his shares in trust, whatever his motive. If the trust is an active one he cannot terminate it at will, and the attempt to cut himself off by contract, instead of by the imposition of duties, from ending it, certainly is not enough to poison the covenant with the plaintiff. It might be held that the duty of voting incident to the legal title made such a trust an active one in all cases. . . . If stockholders want to make their power felt, they must unite. There is no reason why a majority should not agree to keep together."

This observation is referred to in many of the cases as *obiter dictum*, but we nevertheless regard it as a sound expression of the law when pertinent facts will admit of its application. It is sustained upon the theory that shares of stock are property and are subject to the right of contract, so long as the thing done is not illegal in itself or would not result in a fraud upon the rights of other stockholders or upon the corporation. See, also, *Smith v. San Francisco & N. P. R. Co.*, 115 Cal. 584, 47 Pac. 582, 56 Am. St. 119, 35 L. R. A. 309.

The logic of the cases upon this side of the controversy is that, in the absence of fraud or an attempt to accomplish an unlawful purpose by lawful means, the agreement will be upheld as within the contract rights of the parties; that, although the voting power may not be disassociated from the stock, it may be from the stockholder, as is the case where a proxy is given under the statute; that the courts will not look to the form or duration of the proxy, if reasonable and founded upon a good consideration, and, under the facts, the complaining party would be denied relief under the general rules of the law.

The question as applied to this case may be stated in more exact terms. Under the statute, the right to vote by proxy being provided and sanctioned, can a shareholder grant that which is in effect an irrevocable proxy for a definite term of years? This is the turning point of the cases. Having passed the question of public policy, we are called upon to inquire into the policy of the statute. That the statute does not prohibit such practices, unless by implication, seems plain.

In searching for the policy of the law, as it is revealed in written statutes, the court will look to the entire subject-matter, rather than to any particular phrase. That the right or duty of a stockholder is not as limited or exact as counsel contends, is made manifest by reference to other sections of the same chapter. That an individual stockholder may constitute a trustee to hold his stock, and that such trustee may vote it "accordingly as a stockholder," is provided by Rem. Code, § 3695. This declaration by the legislature would indicate that it had in mind the right of a stockholder (corporate stock is personal property, § 3693) to treat his property as any other property, leaving the parties who contract with reference thereto to their legal rights *inter sese*. At any rate, it cannot be said, in the light of the two sections, 3686 and 3695, that § 3686 "contains any inhibition, or condemnation of, the separation of the ownership of stock from the right to vote it." *Carnagie Trust Co. v. Security Life Ins. Co. of America*, 111 Va. 1, 68 S. E. 412, 31 L. R. A. (N. S.) 1186. If, then, an individual stockholder could act through a trustee under a permissive statute, or by a proxy under § 3686, it nowhere being required that either the trustee or the proxy should have a beneficial interest in the *corpus* of the trust, we can find no reason in the law for holding that any number may not join in the selection of joint agents having the same lack of property interest. Public policy, either generally or as defined or intimated by the acts of the legislature, is not a matter of per-

sonal opinion, for what may seem to be sound public policy to one may be rejected by another. *Besant v. Wood*, L. R. 12 Ch. Div. 605.

"Public policy" is not a resort where argument fails. It is itself an argument, and is never advanced in private controversies unless it is plain that the interest of the whole public will be jeopardized, or a statute will be violated, by affirming the questioned contract.

"If there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by courts of justice." *Printing & N. R. Co. v. Sampson*, L. R. 19 Eq. 462, 465.

Voting by one having no private personal or pecuniary interest in the stock being permitted by our statutes in the instances noted, it would seem that the act should be held to be directory and not exclusive, it nowhere being made to appear that the public interest will be hurt in any degree whatsoever.

It is the settled policy of the law, in treating contracts that are not in themselves void on the ground of public policy, to recognize and sustain the right of the parties to deal freely, and unless a statute, which provides in general terms that a thing may be done in a certain manner, is clearly prohibitory in its terms, or carries some penalty for its violation, to hold it to be directory. This is especially so where no inherent illegality is set up and the controversy is between the parties.

The legality of voting trust contracts has engaged the attention of the courts for several years. The legislature has assembled three times since the decision in the case of *Winsor v. Commonwealth Coal Co., supra*, was pronounced, and it is significant that the doctrine announced in that case has not been challenged. It is true that the particular question we are now discussing, that is, whether the voting trust

agreement contravenes the statute, was not discussed by the court, but the fact that a voting trust agreement was upheld would itself have been enough to excite the interest of the legislature and to call for a positive statutory enactment, if, in its judgment, such agreements offend public policy or contradict the letter or spirit of the statute. We find the observations of text writers and annotators, that the tendency of the courts appears to be toward the view that such are valid agreements and cannot be revoked at the mere will and pleasure of any stockholder who may have become a party thereto, are well sustained. Mr. Mechem in his Modern Law of Corporations, § 1270, finds the consensus of opinion to be that a voting trust agreement may be illegal if its object is the accomplishment of some illegal end or to circumvent some positive prohibition of the statute, but where the object is legitimate and is not tinctured by fraud, the courts will not destroy the contract of the parties or construe a statute literally, when the signers have disagreed among themselves and can find no resort other than an asylum under the refreshing shade of public policy. 2 Mechem, Modern Law of Corporations, § 1270; 2 Cook, Corporations (7th ed.), § 622, 622f.; 3 Clark and Marshall, Private Corporations, § 657; 1 Thompson, Corporations (2d ed.), § 889 *et seq.; Morel v. Hoge,* 130 Ga. 625, 61 S. E. 487, 16 L. R. A. (N. S.) 1136; *Carnagie Trust Co. v. Security Life Ins. Co.,* 111 Va. 1, 68 S. E. 412, 31 L. R. A. (N. S.) 1186, 21 Ann. Cas. 1297; 7 R. C. L. 330, 331.

It may be said, finally, that voting trust agreements are valid and binding, if based upon a sufficient consideration, if they do not contravene public policy or a positive prohibitory statute, and if they do not sound in fraud or wrong against the stockholders. Wherefore, the object and not the form of the agreement furnishes the test, and where the trust is voluntarily created as a condition precedent to a loan to protect those who have furnished the money that has put the

life into a corporation, the courts should not seek further for a consideration. The situation of the plaintiff is completely. met by the words of Justice Swayze, who delivered one of the several opinions in *Warren v. Pim*, 66 N. J. Eq. 353, 59 Atl. 773, at page 408:

"Can it be contended that, if a corporation finds it necessary to borrow money upon bonds issued for a long term. of years, the stockholders cannot, consistently with public policy, in order to secure the loan, vest the management of the corporation in hands satisfactory to the lenders and for a term commensurate with the loan?"

It will be noted that the trust agreement here assailed automatically expires when the preferred stock and outstand-. ing bonds are retired.

Counsel say that they make no contention that the contract was intended to advance any illegal purpose or to operate as a. fraud on the company or its stockholders, but insist that, if we do not hold the contract to be void as contrary to public policy or in contravention of the statute, we will not be in accord with the weight of authority; with but two cases, in fact, to sustain our conclusion. We do not so read the cases. Our finding accords rather with the conclusion of Mr. Thompson on Corporations (2d ed.), § 895: "That a great majority of voting trusts coming before the courts have been held illegal, does not necessarily imply that all such combinations are void," and the saving grace as applied or admitted in the cases is comprehended within the admission of counsel; for, as the text continues, "The later cases show that careful corporation lawyers are able to draft agreements creating these trusts that are valid, by avoiding the features that the courts have condemned." It is so in this case.

Feeling that the case should be decided upon its real merit, we have purposely avoided a discussion of the equities of the case, the doctrine of estoppel; and the argument advanced by respondents that the owners of three-fourths of the

stock are not complaining, and having a right by force of numbers to fix the plans and policy of the company, plaintiff's cause is without merit.

The decree is affirmed.

ELLIS, C. J., FULLERTON, MAIN, and MORRIS, JJ., concur.