## MACKIN v. NICOLLET HOTEL, Inc. (COOPER, Intervener).

(District Court, D. Minnesota, Fourth Division. February 9, 1926.)

**1. Corporations ☞198—Common stock voting trust agreement for protection of bond and preferred stock holders held valid.**

Common stock voting trust agreement, made to provide for continuity of capable management of hotel for term of years, as inducement to, and for protection of, bond and preferred stock holders, who invested over six times par value of common stock to finance building of hotel, in at least partial reliance on such agreement, *held* valid.

**2. Corporations ☞198—Voting trust agreement held not affected by, nor violative of, state law limiting time for voting proxies.**

Voting trust agreement by common stock holders of Delaware corporation doing business in Minnesota *held* not affected by, nor violative of, Gen. St. Minn. 1923, § 7461, limiting time for voting proxies, where by-laws otherwise provided, as contemplated by statutory exception.

In Equity. Suit by Daniel Mackin against the Nicollet Hotel, Inc., and others, wherein Austin A. Cooper intervened. Bill dismissed.

Hubert Harvey and A. J. Hertz, both of St. Paul, Minn., for plaintiff and intervener.

T. D. Sheehan, of St. Paul, Minn., for defendant Dixson.

Cobb, Wheelwright, Hoke & Benson, of Minneapolis, Minn., for other defendants.

JOHN B. SANBORN, District Judge. This cause came on for trial before the court at Minneapolis, Minnesota, on the 16th day of December, 1925. The defendant Glen S. Dixson was the owner of a leasehold interest in a tract of land in the city of Minneapolis, Minn., upon which stood what was known as the old Nicollet Hotel. The Nicollet Hotel, Incorporated, a Delaware corporation, was organized at the instance of a group of men interested in the commercial welfare of Minneapolis, for the purpose of adding to the hotel accommodations of that city. Arrangements were made to have Dixson take 2,500 shares of common stock for his lease and to erect a new Nicollet Hotel upon this property. The cost of the hotel was to be about $3,000,000, to be raised by the sale of $1,800,000 of first mortgage bonds and $1,250,000 of preferred stock.

On February 6, 1923, the Minnesota Loan & Trust Company, the Minneapolis Trust Company, and the Wells-Dickey Trust Company, all of Minneapolis, accepted the application of the Nicollet Hotel, Incorporated, for a loan of $1,800,000, to be secured by first mortgage bonds and a trust deed covering the hotel property. In the application for the loan, the following statement was made: "The borrower agrees that a voting trust agreement covering all of the common stock of the borrower will be executed in the form and on the terms and conditions satisfactory to you, and your acceptance of this application is conditional upon the execution of such agreement."

On February 8, 1923, application to the state securities commission of Minnesota for a license to sell its preferred stock was made by the corporation, which application contained the following language: "The common stock of the corporation is to be trusteed with three trustees for a period of ten years for the protection of the preferred stock holders"—and further recited that the preferred stock is " * * * fully safeguarded through the immediate deposit of all common stock under a ten-year voting trust." On February 15, 1923, the commission issued a license to the corporation to sell its preferred stock, subject to the condition that the common stock be trusteed.

On March 3, 1923, a voting trust agreement was made, with A. E. Zonne, Glen S. Dixson, and Joseph Chapman as voting trustees, which contained the following recitals:

"Whereas, the said corporation desires to erect upon the said premises hereinbefore described a new hotel building and is in need of funds for such purpose, and for the purpose of raising part of the necessary funds to build and equip said hotel building proposes to issue and sell bonds in the amount of one million eight hundred thousand dollars ($1,800,000), secured by mortgage or trust deed on the property of said first party, and also to sell one million two hundred fifty thousand dollars ($1,250,000) par value of its preferred capital stock; and

"Whereas, for the purpose of inducing third parties to subscribe for and purchase the preferred capital stock of said corporation, and to purchase such bonds, the undersigned stockholders have offered to transfer their shares of common stock in said corporation to said parties of the second part as voting trustees under the terms hereinafter set forth."

The consideration for the voting trust is stated in the instrument as follows: "In consideration of the premises, and the benefits to be derived by the undersigned stockholders in said corporation from the purchase

by third persons of the preferred stock of said corporation and of said bonds of said corporation. * * *"

The voting trust agreement provided that the common stock should be assigned to Zonne, Dixson, and Chapman as trustees; that they should issue trustees' certificates therefor, which might be sold on condition that the purchasers or assignees accepted the provisions of the voting trust. It also provided, among other things, that, should a vacancy occur in the office of the first trustee, it should be filled by a selection, made by a majority of the three trust companies which underwrote the bond issue, from the board of directors of the Nicollet Hotel, Incorporated, or, if none was willing to act, then from the residents of the city of Minneapolis; that, if a vacancy should occur in the office of second trustee, it should be filled by a trustee selected by the holders of the voting trust certificates representing a majority of the common stock; and that, in case of a vacancy in the office of the third trustee, it should be filled by the Minnesota Loan & Trust Company, trustee for the bondholders, from the present board of directors, or, if none should be willing to act, then from the residents of the city of Minneapolis.

It was also provided that a majority of the holders of the preferred stock of the Nicollet Hotel, Incorporated, might remove the first trustee and appoint a new trustee, but that such trustee must be selected from the present board of directors, but, if none residing in Hennepin county was willing to act, from the residents of the city of Minneapolis; that the Minnesota Loan & Trust Company, trustee for the bondholders, might remove the second trustee and appoint a new trustee, from the present board of directors, or, if none were willing to act, then from residents of Minneapolis; and that the holders of voting trust certificates representing a majority of the common stock might remove the second trustee and appoint a new trustee in his place.

Under the trust agreement, the trust shall continue for ten years, or until all outstanding preferred stock shall be retired, and, if it shall not be retired before the expiration of ten years, then the trust shall be continued in two-year periods for an additional term of ten years: Provided that any holder of a trust certificate may, upon notice before the end of the ten-year period, or before the end of any two-year period, withdraw his shares of common stock at the end of the period in which such notice shall have been given, and provided, further, that

the holders of trust certificates representing one-half of the common stock may, upon notice, cause the expiration of the trust at the end of the ten-year or any two-year period. The trustees are required to select themselves as directors, and to re-elect the present board of directors, so long as the trustees, or a majority of them, believe them to be suitable.

Mr. Dixson executed the trust agreement on March 3, 1923, and deposited his 2,500 shares of common stock. Shortly thereafter, Haglin & Sons Company and Holabird & Roach, the other common stock holders, likewise executed the agreement and deposited the 1,600 shares and 400 shares which they owned. That constituted all the common stock of the corporation. The $1,250,000 of preferred stock was sold and is outstanding. In July, 1923, the trust deed to the Minnesota Loan & Trust Company of Minneapolis, securing the $1,800,000 of bonds, was delivered and the money paid to the corporation. All of the bonds are issued and outstanding.

Article IV of the trust deed is as follows:

"The holders of the common stock of the company have heretofore entered into a voting trust agreement, dated the 3d day of March, 1923, with A. E. Zonne, Glen S. Dixson, and Joseph Chapman, as voting trustees, and the company covenants and agrees that it will cause said voting trust agreement to be fully carried out and performed, in accordance with the terms thereof, and will cause the same to remain in full force and effect until all of the bonds secured hereby have been paid."

It is provided that, if default shall be made in any covenant or condition of the trust deed, or if a receiver shall be appointed for the corporation, the deed may be foreclosed. The hotel was built with the funds procured from the sale of these bonds and preferred stock, and has been operated under the direction of a board of directors elected by the voting trustees, pursuant to the trust agreement.

The plaintiff, Mackin, and Cooper, the intervener, are the owners of trust certificates representing 80 shares and 1,520 shares, respectively, of the common stock held by the defendant trustees. Their claim is that the voting trust is void; that the trustees and those appointed by them have mismanaged the company and have caused large losses; that, in the event of a stockholders' meeting, the trustees will vote the common stock; and that the plaintiff has been denied the right to inspect the books. To put it briefly, they say that they are denied their rights

as common stock holders because of this trust agreement, that they do not approve of the management, and they ask this court to declare the agreement void, and to appoint a receiver until they and the rest of the beneficial owners of the common stock can organize and elect a board of directors of their own, to take over and manage the hotel property.

It is very doubtful whether the plaintiff has complied with equity rule 27. There is no allegation that the suit is not collusive, and no allegation that the officers or directors of the Nicollet Hotel, Incorporated, have ever been asked to do anything with respect to the matter, except to permit an inspection of the books; but the plaintiff claims that the facts alleged are sufficient to show that the defendants are antagonistic, and to excuse a compliance with the rule. It is also doubtful whether all necessary parties have been joined. It does not appear even that all holders of trust certificates who will be directly affected by a decision of this case have been joined. It would not, however, dispose of this controversy to base a dismissal upon those questions only, and, so far as this court is concerned, it may as well pass upon the main question.

[1] It is the contention of the trust certificate holders that this voting trust agreement, in reliance upon which the preferred stock and bonds of this corporation were sold, is void, as against public policy, because it separates the voting power from the owners of the beneficial interest in the common stock, takes away from the common stock holders their duties and responsibilities to the corporation, and puts them in the hands of men who may or may not have a financial interest in the corporation.

The purpose of the trust agreement is obvious. It is to provide for continuity of capable management for a period of years as a protection to those whose money built this hotel. The bondholders and preferred stock holders are the ones who made the enterprise possible. The common stock holders have the speculative interest in it. The total issued common stock, assuming that it was worth par, represents an investment of cash or property of $450,000, as against a $3,000,000 investment on the part of others. No improper motives can be imputed to those who were to sell their customers these securities in wanting to have the common stock trusteed, so that it might not fall into the hands of persons who would either so use it as to force those who had the larger investment to take it off their hands at their

price, or who might not be capable of securing competent persons to operate the hotel.

Can a court of equity set aside a voting trust agreement pursuant to which common stock holders of a corporation assign their stock to trustees for a certain period of time as an inducement to and for the benefit of those who become the preferred stock holders and bondholders of the corporation? The contention of the certificate holders would impress itself more favorably upon the court if the question had been raised prior to the investment of $3,000,000 in partial reliance, at least, upon the agreement which the common stock holders made in order to procure that investment. As a matter of good morals, their position cannot be justified. It is true that there is respectable authority to the effect that an agreement by which the voting power of stock is severed from the beneficial ownership is void per se, irrespective of the propriety of the purpose sought to be accomplished. Carnagie Trust Co. v. Security Life Ins. Co. of America, 111 Va. 1, 68 S. E. 412, 31 L. R. A. (N. S.) 1187, 21 Ann. Cas. 1287, and cases cited.

Perhaps as good a statement of the present state of the law on the subject as can be found is that in 7 R. C. L. at page 349. It is there said:

"The decisions passing upon the validity of such stock voting agreements or voting trusts are to the general effect that the agreement is not unlawful in itself, but that its validity depends upon the legality of the purpose for which the agreement is formed. There is, however, a marked lack of uniformity in the cases. Some of them are decided upon considerations as to the nature of irrevocable proxies; others rest upon the statute law of the state in which they are rendered; yet others assert inseparability of the voting power of stock from its ownership; while very many, as stated, rest upon the fraudulent or otherwise objectionable character of the object to be attained. According to a few decisions an agreement by which the voting power of the stock is severed from the beneficial ownership is void per se, irrespective of the propriety of the purpose sought to be accomplished in the particular case. * * * In considering the cases, however, and the text-writers who have commented upon them, it is impossible not to be impressed with the change of opinion which has taken place with respect to the true nature of such contracts. In the early stages of the development of voting agree-

ments, there was a strong sentiment against them; but experience has demonstrated their usefulness, and the hostility evinced toward them has by degrees diminished. In some states they are specifically authorized by statute. Assuming that the general policy of the law prohibits the separation of the voting power from the beneficial interest, yet such a separation is now deemed to be justified, where there is a property interest to conserve, some definite policy in the interest of the corporation to be carried out, some beneficial interest of the stockholders to be served, or some purpose not unlawful of an advantageous character to the stockholders to be effectuated. Again, the character of the trust agreement is held to be important in determining its validity. An attempted surrender of the mere voting power is held ineffectual; but a grant to trustees coupled with an interest is deemed valid."

Where the purpose of the voting trust is to secure the continuation of an established business policy, it has been held not invalid. Boyer v. Nesbitt, 227 Pa. 398, 76 A. 103, 136 Am. St. Rep. 890. A contract by which the owner of a majority of the stock of a corporation agrees with one to whom he transfers a portion of his stock, in consideration of a loan of money to finance the corporation, that the stock be pooled for a term of years in order to control the management, has been held valid. Winsor v. Commonwealth Coal Co., 63 Wash. 62, 114 P. 908, 33 L. R. A. (N. S.) 63; Clark v. Foster, 98 Wash. 241, 167 P. 908; Thompson-Starrett Co. v. Granite Co., 86 Vt. 282, 84 A. 1017; Greene v. Nash, 85 Me. 148, 26 A. 1114; Smith v. San Francisco, etc., R. Co., 115 Cal. 584, 47 P. 582, 35 L. R. A. 309, 56 Am. St. Rep. 119. See, also, the following: Note to Morel v. Hoge, 16 L. R. A. (N. S.) 1136; also note to Carnegie Trust Co. v. Insurance Co., 31 L. R. A. (N. S.) 1186; Bowditch v. Jackson Co., 76 N. H. 351, 82 A. 1014, L. R. A. 1917A, 1174, Ann. Cas. 1913A, 366; White v. Snell, 35 Utah, 434, 100 P. 927; Ecker v. Kentucky Refining Co., 144 Ky. 264, 138 S. W. 264; Brightman v. Bates, 175 Mass. 105, 55 N. E. 809; Borland v. Prindle, Weeden & Co. (C. C.) 144 F. 713; 14 C. J. 915.

In a situation such as is involved in this case, the beneficial interest in the stock is a speculative one. The holders of it have what amounts to a mere equity in the property or enterprise. At the outset the voting power of the stock is the thing of value, and any one loaning money to a corporation such as this, in order to be secure, must know where that voting power is to lie for a period of time sufficiently long to assure him of the repayment of the money which he has invested. The trusteeing of this stock was one of the things which was necessary, in order to finance the building of the hotel and its subsequent operation.

[2] There is no merit to the contention that the voting trust agreement violates section 7461, G. S. of Minnesota 1923, which limits the time within which proxies may be voted—first, because the laws of Minnesota have nothing to do with the proxies of a Delaware corporation; and, second, because the section of the statutes referred to starts out with the words, "Unless otherwise provided in the certificate or by-laws," and it is otherwise provided in the by-laws of this corporation. The voting trust agreement is valid, and for that reason this bill must be dismissed, with costs to the defendants and against the plaintiff and intervener.

It is so ordered.