## Ecker v. Kentucky Refining Co., et al.

(Decided June 16, 1911.)

### Appeal from Jefferson Circuit Court (Chancery Branch, First Division).

1. Corporations—Reorganization—Suit by Stockholder to Set Aside —Appellee finding itself in an involved financial condition effected a reorganization to the plan of which appellant, a stockholder did not consent and instituted an action to set it aside. Appellant by answer pleaded facts showing a re-organization necessary if the company was to continue in business at all, and that the plan adopted was agreed upon by all the stockholders and parties in interest save appellant. Held, that there is no charge of fraud or unfairness upon the part of any of the officers or directors of the company, and the plan of re-organization was all that could be done under the circumstances to save the business from wreck and ruin. By reason of the re-organization appellant's stock has been given a value which it did not have, and no ground of complaint is afforded him because perchance those who made the re-organization along the lines adopted possibly may ultimately realize a profit out of the venture.

2. Same—There being no fraud, and the negotiations looking to the re-organization having been conducted, not by the directors, but by the stockholders themselves, the chancellor correctly held that appellant was not entitled to the relief sought.

BODLEY & BASKIN for appellant.

ARTHUR M. RUTLEDGE and HELM & HELM for appellees.

OPINION OF THE COURT BY JUDGE LASSING—Affirming.

This appeal involves the right of one of its stockholders to have a reorganization, effected by the Kentucky Refining Company in February, 1909, invalidated. Said company was engaged in refining crude cotton oil. It owned a large plant at Louisville, Kentucky, and practically all of the stock of nine crude cotton seed oil mills or companies, located at different points in the south. It was capitalized at $1,600,000. $1,000,000 was common stock and $600,000 preferred. It owned all of the stock of these nine crude mills except ten shares. It had paid for the stock in these nine mills $549,000. It placed betterments and improvements upon them costing about $550,000; so that the cost of these nine mills represented an investment to the refinery of $1,100,000. Practically the same board of directors that managed the affairs of the Refining Company managed the nine mills.

In 1907 the Refining Company found itself in very straightened financial circumstances. It owed upon its own notes $492,000. It had endorsed the notes of these nine subsidiary plants to the extent of $820,000, and had received of the proceeds arising from these endorsements $642,000. Its total indebtedness, individual and as endorser for its subsidiary plants, at that time amounted to more than $1,300,000. The cash assets of the nine subsidiary plants consisting of all its stock, of the book value of $550,000, the real value of which was estimated to be $300,000; and all other assets of said companies amounted to $325,000, making total actual assets of $625,-000, against liabilities amounting to $820,000. The Refining Company's assets consisted of tank cars, costing $160,000, valued at $80,000, real estate costing $500,000, valued at $250,000, and all other assets valued at $300,-000, making its total assets $630,000; against which there were liabilities amounting to $492,000, leaving its individual assets over its liabilities, $138,000. As it was by endorsement answerable for all of the liabilities of the subsidiary plants over and above their assets, which amounted to $195,000, it is readily seen that all these corporations were utterly insolvent. Their creditors were scattered over the entire United States; many of the claims against them had been placed in the hands of attorneys in Louisville, who were demanding payment; bankruptcy proceedings were threatened; one of the subsidiary companies in the south had been placed in the

hands of a receiver; quite a large sum of money belonging to the company in one of the New York banks had been attached; the business of appellee was demoralized; its credit was ruined; and in this condition a meeting of the creditors and stockholders was called. At this meeting the condition of the company's affairs was gone over and ways and means discussed and considered with a view of devising some plan by which the company could be permitted to continue in business. The officers of the company and its stockholders were powerless. They had exhausted their resources and were compelled to accede to and accept such terms as their creditors were willing to make with them. After much discussion a plan of reorganization was agreed upon, by which the creditors agreed that, if the capital stock of the refinery was reduced to $400,000, $200,000 of which should be common stock and $200,000 preferred stock, and $270,000 additional stock issued, and this stock made a first preferred over the common and preferred stock then outstanding, and $100,000 in cash raised and put into the business, they would extend the time for the payment of the balance of their debts so as to enable the company and its subsidiary plants to convert their quick assets into cash and thus meet their obligations. It is conceded that, if the companies' business had been closed out at that time the total assets would not have paid the creditors more than 75c or 80c on the dollar, and the stockholders, neither common nor preferred, would have realized anything whatever on their stock. Recognizing the hopeless condition in which the company's financial affairs were involved, all of the holders of the common stock, and holders of the preferred stock representing 99% thereof, and all of the creditors, some 300 or more in number, agreed to the plan of reorganization. J. F. Ecker, the owner of $6,000 worth of preferred stock, did not consent to the plan of reorganization, and after it had been carried into effect, instituted a suit to have it set aside. The company in its answer pleaded the facts, showing that a reorganization was absolutely necessary if the company was to continue in business at all, and that the plan adopted was that agreed upon by all of the parties in interest save plaintiff. It further pleaded that, in order to carry out the proposed reorganization, it was necessary to raise $100,000. For the purpose of doing this a new corporation was formed, known as the Central Cotton Oil Co. Some of the holders of common stock in the Refining

Company became subscribers to stock in the Central Cotton Oil Company. Under the terms of the plan of reorganization the Central Cotton Oil Co. took over all of the stock of the nine cotton oil mills, paid the $100,000 cash, and obligated itself to pay the $820,000 indebtedness of these subsidiary plants and to relieve the parent company of all liability on account of its endorsements for these plants. This $100,000 was needed and used as a working capital, and the Central Cotton Oil Co. mortgaged its nine plants, so acquired, for $550,000, and, agreed to convert its quick assets into cash and out of same to pay on account of the indebtedness $300,000 within a reasonably short time thereafter, thus fully satisfying the $850,000 for which the obligations of the nine subsidiary plants were outstanding. The $270,000 first preferred stock issued by the Kentucky Refining Co. was accepted by the creditors as part payment on their claims, and this company obligated itself to pay out of its quick assets on February 10, 1910, $200,000, making a total payment toward the discharge of the indebtedness on the part of the Kentucky Refining Co. of $470,000. This, with the $850,000 provided for by the Central Cotton Oil Co., discharged and satisfied all of the indebtedness of both the Kentucky Refining Company and its nine subsidiary plants.

It was further agreed that, in order to see that the arrangements and obligations assumed by the Kentucky Refining Company and the Central Cotton Oil Company were carried into effect, the affairs of both companies should be managed by a committee of five persons, three of whom were selected by the creditors and two of whom were selected by the stockholders of the Refining Company. Three members of this committee constituted an executive board, and under the arrangement they were to receive $2,000 per year each for their services. Of this compensation the Refining Company was to pay $3,600 and the Central Cotton Oil Co. $2,400.

The plans for the reorganization were drawn with care and much detail. The main object throughout, it is evident, was to secure and protect the creditors in their rights.

The whole plan of reorganization was set out in the answer. A demurrer was filed to this answer and overruled. The plaintiff declined to plead further, and his petition was dismissed. He appeals, and relies upon sev-

eral grounds for reversal, which we will consider in the order of their importance.

It is first argued that the reorganization in effect, if not in fact, amounted to a dealing by the common stockholders of the Kentucky Refining Company with themselves to their benefit and at appellant's expense, and on this account that it was void. Second, that the preferred stock, of which appellant's was a part, was illegally reduced. Third, that it was a constructive fraud upon appellant's rights to burden the Refining Company with a portion of the expense of reorganization. And fourth, that the establishment of the voting trust was illegal.

As to the first proposition, it is made to appear that the common stock of the Refining Company was, at the time the plan of reorganization was taken under consideration, owned by the following persons: R. C. Waggener, E. E. Paine, C. M. Hallman, A. M. Rutledge, Frank J. Fulton, F. W. McKee, Cortland Van Camp, John W. Bolus, and M. S. Harper. While it was in process of completion R. C. Waggener and E. E. Paine sold their stock to W. D. Campbell, who prior to that time owned no stock. The preferred stock was held, as follows: E. H. Ferguson, J. N. Ferguson, P. M. Ferguson, and J. E. Ecker. During the reorganization J. N. and P. M. Ferguson sold their stock to Cortland Van Camp, who prior to that time owned no preferred stock, but held 1,950 shares of the common stock. The board of directors consisted of R. C. Waggener, Cortland Van Camp, F. W. McKee, Frank J. Fulton, C. M. Hallman, E. E. Paine, and A. M. Rutledge. Following the reorganization the board of directors was changed to some extent, and the affairs of the company were thereafter managed by C. M. Hallman, F. W. McKee, J. C. F. Slayton, L. S. Mitchell, and J. B. Brown. Waggener, Van Camp and Fulton retired from the board, their places being filed by Slayton, Mitchell and Brown, none of whom had theretofore owned stock in the Refining Company. The Central Cotton Oil Co. was incorporated by the following named persons, who subscribed for the 4,000 shares of stock of the par value of $25 each, at which it was capitalized: W. D. Campbell, C. M. Hallman, J. C. F. Slayton, J. B. Brown, L. S. Mitchell, Cortland Van Camp, F. W. McKee, and Frank J. Fulton. The directors of the Central Cotton Oil Co. were Mitchell, Brown, McKee, Slayton and Hallman, the same as the directory of the Refining Company after the

reorganization. The interests of Hallman, Slayton, Brown and Mitchell in the Central Cotton Oil Co. were merely nominal, each owning but one share, while Hallman owned practically three-tenths of the common stock of the Refining Company. Certainly it could not be charged that any advantage accrued to him by reason of the organization of the Central Cotton Oil Co. and the sale or surrender to it by the parent company of the subsidiary plants. Upon a careful consideration of the record the conclusion is irresistible that the Central Cotton Oil Co. was not organized for the purpose of giving to those of its shareholders who were holders of common stock in the Refining Company any advantage whatever, but for the purpose of preventing immediate steps looking to the settlement and dissolution of the affairs of the parent company and its subsidiary plants.

There is no charge of fraud or unfairness upon the part of any of the officers or directors of the company, but the claim is made that, under the plan of reorganization as adopted, those of the common stockholders who became members of the new corporation, the Central Cotton Oil Co., may derive a profit out of the business and thereby save themselves from loss or give value to their stock at the expense of the preferred stockholders in the parent company, of which appellant was one. When reduced to its last analysis, the claim amounts to this; a stockholder in a corporation may not deal with that corporation to his advantage, or even to his possible advantage, even though the transaction be open, thoroughly understood, and free from fraud.

In Clark on Corporations, Sec. 199, we find the rights and powers of a stockholder in a corporation to deal with the company thus stated:

"The members or stockholders, as we have heretofore pointed out, compose the corporation, but they are not the corporation. They have as much right to deal with the corporation as a stranger would have, and may sue on its contracts. Thus they may advance money to it in excess of the capital contributed, and the result will be a debt due them by the corporation, which will stand upon exactly the same footing as such a debt due a stranger."

This is the true rule as we know of no authority holding to the contrary.

Officers and directors do not stand in so favored a light, but their transaction with corporations are always

to be closely scrutinized, and are held to be voidable at the election of the stockholders of the corporation where such transactions have resulted in a personal benefit or gain to the officer or director. Clark on Corporations, p. 500. It must be borne in mind that the whole scheme or plan of reorganization adopted here was considered and entered into by the stockholders, acting in conjunction with the creditors, who were in fact directing and shaping the future affairs of the Refining Company. The conduct of the stockholders is not subject to criticism, and the case of Bramblett v. Com. Land & Lumber Co., 26 K. L. R. 1176, does not support the contention of appellant's counsel. In that case the president and a director of the corporation, acting in collusion, bought up claims against the company for less than their face value. It was held that they might not deal to their profit at the expense of the corporation, whose interest, as an officer and director, it was their duty to protect. This was a secret arrangement on their part by which they were attempting to enrich themselves at the expense of the corporation, a state of facts wholly unlike that under consideration. Here the plan of reorganization was considered and discussed and understood by all of the stockholders and creditors, and, as said by the Chancellor in his opinion, ''the various provisions of the reorganization contract were splendidly conceived and boldly executed with a frankness which inspired confidence in creditors who otherwise would have been sceptical.'' We fail to find in the plan of reorganization, as adopted, any conduct on the part of those who participated therein that would be subject to criticism, even had the plan of reorganization been suggested and carried into effect by the officers and directors of the company rather than by its stockholders. It was all that could be done under the circumstances to save the business from wreck and ruin. By reason of this reorganization plantiff's stock has been given a value which it did not have, and no ground of complaint is afforded him because perchance those who made the reorganization along the lines adopted possible may ultimately realize a profit out of the venture.

The case of Price v. Thompson, 84 Ky. 219, Penn v. Rhoades, 124 Ky. 803, and Widrig v. Newport Street Ry. Co., 82 Ky. 511, are not in conflict with the view herein expressed, nor is a contrary rule announced in the case of P., C. C. & St. L. Ry. Co. v. Dodd, 24 Rep. 2057.

On the contrary, that opinion is an authority against the contention of appellant, for it is there said that:

"Under this application of the rule discussed it does not follow that every contract entered into between two corporations having directors in common is void, or even that it may be set aside upon the complaint of a single stockholder for that fact alone. (Roberts v. Wash. Nat. Bank, 11 Wash. 550, 40 Pac. Rep. 225, and notes, 2 Am. & Eng. Dec. equity, 272-284.) We go no further than to say that upon an allegation of fraud upon the part of his directors, or upon an allegation of facts showing that the directors (who are also directors of another contracting corporation), because of conflict of interest and duty, could not, or ought not to act in the matter, coupled with the further allegation showing material damage to the complaining stockholder by reason of the transaction between the two corporations, a court of equity will hear a single stockholder's complaint, and if the charges be sustained by the proof, will grant appropriate relief."

Clearly, if the charges of fraud are not sustained, the relief sought would be denied. In the case under consideration, there being no fraud, and the negotiations looking to the reorganization having been conducted, not by the directors, but by the stockholders themselves, the Chancellor correctly held the plaintiff was not entitled to the relief sought.

As to the complaint that the stock was illegally reduced, it is sufficient to note that this reduction was made with the written consent and approval of all of the holders of the common stock and those owning 99% of the preferred stock. Secs. 553 and 564 of the Kentucky Statutes provide how the stock of a corporation may be reduced, and the stockholders here followed strictly the statutory provisions. The capital stock of the company was impaired; it was practically destroyed, and it was necessary that the stock be reduced in order that the capital stock should not exceed the appraised value of the company's property. No ground of complaint is afforded because the stock was reduced.

Appellant also complains that the affairs of the corporation were placed in the hands of a committee of five, to be managed and operated by it, and that the compensation for such committee was borne by the respective companies in the proportions above indicated. This was a part of the plan of reorganization. The creditors were

unwilling that the reorganization should be effected without being given a right to representation upon the boards of both companies in order that their interests might be properly looked after and protected.  Men of ability and experience, capable of directing the affairs of these corporations, could not be expected to serve without compensation, and as the whole plan or reorganization looked ultimately to the giving of value to the stock in the parent company, though primarily to the securing of the creditors in their claims, it is but proper and right that the parent corporation should bear a part of this expense, and the 60% assessed against it as its proper share seems equitable and fair.

The right of the stockholders in a corporation to create a voting trust for a lawful purpose, to-wit; the protection and promotion of the best interests of the company, has been approved in Mobile & Ohio R. Co. v. Nicholas, (Ala.) 12 Southern 723; Smith v. San Francisco, etc., Co., (Cal.) 35 L. R. A. 309; Irwin v. Phil. & Reading R. R. Co., 7 R. R. Corp. L. J. 8, and Gage v. Fisher (N. D.), 31 L. R. A. 557.  Here the purpose for the creation of the special committee to control the affairs of the corporation until the claims of the creditors had been satisfied, according to the arrangement entered into was perfectly proper and legitimate.

We are of opinion that, although such holders of the common stock in the parent company as became stockholders in the Central Cotton Oil Co. may ultimately realize a profit out of the transaction, no ground of complaint is afforded appellant on this account.  They furnished the cash that was absolutely necessary to carry out the reorganization, they were under no duty, legal or moral, to enter into this arrangement, and they are entitled to whatever profit may accrue to them on this account.

If we felt less certain of our position in this regard, we would be constrained to hold, upon another ground, that appellant was not entitled to the relief sought.  He was fully advised as to the plan of reorganization, knew and understood that it was being carried into effect, and, in the possession of this knowledge, took no steps whatever to prevent it from being done, but waited until the $100,000 had been paid, the $270,000 of first preferred stock of the Refining Company issued, the subsidiary plants mortgaged, the quick cash assets of both the Re-

fining Company and the subsidiary plants convertea into cash, and the conditions so changed that to now set aside and invalidate the reorganization would be to work an irreparable injury to those who in good faith entered into it. The affairs of the company have been so changed that it would be impossible to restore the status quo. Appellant should not have waited until the reorganization had been carried into effect before seeking relief. He should have acted promptly, and by his failure to do so he has forfeited any rights that he might have had if he had sought the relief in due and seasonable time.

Upon consideration of the record as presented we are satisfied that the conclusion reached by the Chancellor was correct.

Judgment affirmed.