**GRAHAM et al. v. METROPOLITAN BUILD-
ING & LOAN ASS'N et al.**

No. 13437.

Court of Civil Appeals of Texas. Fort
Worth.

Oct. 23, 1936.

Rehearing Denied Nov. 20, 1936.

Goggans & Ritchie, Robert Allen Ritchie,
and John B. Stigall, Jr., all of Dallas, for
appellants.

Wm. H. Flippen and Dan P. Johnston,
both of Dallas, for appellees.

DUNKLIN, Chief Justice.

After the decision of the Commission of
Appeals shown in the opinion of Justice
Critz in Connally v. Continental Southland
Savings & Loan Association, 121 Tex. 565,
51 S.W.(2d) 293, that association, herein-
after designated as the Continental Asso-
ciation, organized and procured a charter
of another building and loan association in
the name of the Metropolitan Building &
Loan Association, hereinafter designated
as the Metropolitan Association, with the
same officers and directors as in the Con-
tinental, to which it transferred a part of
its assets. Apparently that proceeding was
under the provisions of article 881a—21a,
Vernon's Annotated Texas Civil Statutes.

Upon petition of the Continental Associa-
tion therefor, the Banking Commissioner
ordered a reduction of 15 per cent. of its
liability to its members, except upon juve-
nile shares, under the provisions of article
881a—56. That reduction was designated
in all the proceedings as a "write down" of
liabilities to its shareholders. The assets

of the association were then divided into two groups, which for convenience we will here designate as Group A and Group B. The assets in Group A were considered solvent and included mortgage and stock loans, etc. The assets in Group B were deemed to be of uncertain values, consisting of mortgage and stock loans and real estate foreclosed.

The Continental then transferred and assigned the assets in Group A to the Metropolitan Association and retained the assets in Group B.

Pursuant to the plan that had theretofore been submitted to the various stockholders of the Continental, the contract of assignment by that company to the Metropolitan embodied agreements to the following effect: The Continental would withdraw and cancel the stock theretofore issued by it, and in lieu thereof would reissue to those stockholders 25 per cent. of the book value of said stock. The Metropolitan would issue to those holders 75 per cent. of the book value of the stock according to the Continental's books. The Continental agreed to distribute to the stockholders the amount of cash then on hand, to wit, some $500,000, as their interest might appear from the by-laws of the association. The Continental agreed to execute to the Metropolitan its promissory note in the sum of $1,814,849.85, with a chattel mortgage on the assets reserved by the Continental, all to secure the Metropolitan against any losses accruing against any claim arising against the assets assigned to the Metropolitan. The stock to be so issued by the Metropolitan was designated as Class A. It was to be issued to the stockholders in the Continental as payment thereon to the extent of $63.75 per each $100 book value of stock owned by the holder in the Continental before the 15 per cent. write down in the stock liability had been applied; that sum being stated as "the exact and proper proportion which the assets purchased and the note received by the Metropolitan Association less reserve for dividends from July 1, 1932 to September 1, 1932, and other necessary reserves aggregating $90,000 bears to the book value of the stock held by such Continental Association shareholders," with the further stipulation that, "should any Continental Association shareholder refuse to accept such Metropolitan stock and the terms of the proposal mailed on October 10, 1932, then an amount representing the proportion at the rate of $63.74 per $100 of the cash payments on such

shares before the 15% write-down of stock liability of any and all of such shares so refused, shall be applied as a credit on the principal of the above mentioned note."

That contract of sale of assets to the Metropolitan was in accord with the plans proposed by the Continental mailed to all of its stockholders and the resolution authorizing and adopting the same passed at a special meeting of the shareholders which had been duly called and notice of which had been given to all the stockholders in accordance with the by-laws of the Continental. And such action by the shareholders was approved by the vote of more than 98 per cent. of all the stockholders.

Accompanying the notice mailed to the various stockholders of the forthcoming special meeting of stockholders was a letter addressed to them reading as follows:

"Dallas, Texas, August 10, 1932.

"To the Investing Shareholders of the Continental Southland Savings & Loan Association:

"The enclosed call for the special stockholders' meeting is, of necessity, long because the Association's plan is set out in detail. In order to assist you in the interpretation of the plan, we give below a brief, practical summary of it:

"We have had our books audited and our assets appraised. Based upon that audit and appraisal, we think your stock is unquestionably worth eighty-five dollars on the hundred of its paid-in value and that you have reasonable chance to receive the other fifteen dollars on the hundred. The plan divides your investment as follows, the example being based on one hundred dollars:

$ 7.00......Cash
63.75......Stock in new dividend paying association
14.25......Stock in liquidating association
15.00......Participation interest in reserves
_____
$100.00......Total

"The $7.00 is to be paid upon acceptance of this plan, and the stock will be delivered to you immediately thereafter or as soon as the shareholders are notified to send their old stock in for transfer. The $15.00 participating interest in the reserves will not be evidenced by a certificate but will be set upon the accounts of the Association in the liquidating company to the credit of the stockholder.

"The stock in the new Association in the amount of $63.75 will commence to earn dividends as of July 1, 1932, and the dividends are to be paid in cash immediately after January 1, 1933. The stock which you will get in the liquidating company in the amount of $14.25 will be subject to further liquidating dividends as soon as enough of the assets can be sold to make a distribution of the cash.

"As soon as the assets are all sold out of the liquidating company and the stockholder has been paid his $14.25 in full as per the above illustration, the further distribution of cash will be paid out of the $15.00 participation account referred to above.

"It can be seen from the foregoing that each shareholder will, in the end, receive the full benefit of the stock that he now owns, and it is our opinion that this plan will enable us to give you your money more quickly than any other plan known to us. It also has the added advantage of separating the good assets from the bad assets, and in that way enabling us to place the majority of your investment on a good, sound dividend-paying basis.

"If you agree to these plans, we urge you to sign the enclosed card and return it to us at once so that the secretary of the Association may record your vote at the stockholders' meeting in case you cannot be there.

"Very truly yours,
                    "W. C. Barns,
                          "Secretary."

The Metropolitan Association was incorporated on the 1st day of September, 1932, with its principal office and place of business in Dallas, Tex., with the same directors and officers as the Continental, and for the same purposes and subject to the same statutory provisions as the Continental. Its authorized capital was $50,000,000, divided into 500,000 shares of the par value of $100 each. The charter contains these provisions:

"Art. VIII, Sect. 2: The Class A Stock shall be limited and restricted to Continental Southland Savings & Loan Association shareholders becoming members of this Association as part consideration of the transfer of certain of its assets to this Association. Such stock shall not be subject to application for withdrawal for a period of two years, unless in the direction of the Board of Directors they may determine to apply thereon fifty (50%) per

cent of its net receipts and then only on a pro rata basis to all shareholders, share and share alike."

"Art. IX, Sect. 1: Withdrawal value of shares shall be all payments made thereon, plus dividends credited, less all lawful charges."

The Continental Association was incorporated under the provisions of Revised Statutes of 1925, with an authorized capital stock of $60,000,000 divided into 600,000 shares of face value of $100 each, and, prior to and at the time of the transaction with the Metropolitan above noted, Miss Rena M. Graham held 20 permanent shares of its capital stock, for which she paid $2,000, the certificate for which was numbered 1697, dated July 1, 1930, and 10 shares of Class A Investment stock in the Continental, evidenced by certificate No. 851, of the par value of $1,000, which was fully paid for and fully matured. The certificate for the permanent stock contained the stipulation, "not subject to withdrawal and nonassessable."

The by-laws of the Continental Association in force at the time contain these provisions:

"Section 2. Members shall be classified as shareholders, with classification of shares as follows.

"Classes 'A', 'B', 'C', 'D' and Permanent Shares.

"Classes 'A' and 'B' shares shall be in the sum of One Hundred ($100.00) Dollars and multiples thereof, evidenced by a pass book and certificate executed by the President or Vice-President and Secretary of this Corporation, and issued upon payment of the initial installment of 50¢ per share on Class 'A' and upon payment of $50.00 per share on Class 'B'. Such payments and all subsequent payments and dividends credited on Class 'B' shall be entered in the pass book issued each shareholder. Class 'C' shares, evidenced by a certificate executed by the President or Vice-President and Secretary or Assistant Secretary, shall be issued in the sum of $100.00 per share, with dividends payable as and when earned and declared, as the series shall provide.

"Class 'D' shares shall be evidenced by a pass book in which shall be credited all payments as and when made by the holder, on which sums the holder shall be credited with dividends as the series may provide.

"Permanent Stock or Reserve Fund, which when sold may not be withdrawn,

until after all liabilities of the Association have been satisfied in full, including the full book value of all other classes of stock, and which shall receive as dividends all the earnings of the Association after expenses have been paid and the maximum dividends provided for other classes of stock have been paid or credited. Permanent Stock must be fully paid for in advance, and against which the Association may not make any loans."

"Article 7. Shares not pledged for security of loans may be withdrawn in whole or in part by giving thirty days' notice and upon withdrawal the holder shall receive such amount as may be to his credit, less all fees, impositions, membership, cancellation or withdrawal fees, if any, which remain the property of the Association, provided, however, the Association will not be bound to pay out upon withdrawal more than one-half of its receipts that month, nor to impair its capital, such withdrawals and payments to be honored only as and when justifiable. The withdrawing member shall surrender his pass book and Certificate of stock at the time of withdrawal. Shares filed for withdrawal shall be paid in the order in which filed and notice given. Shall there be on hand funds that the corporation is unable to safely loan, the Board of Directors may, at its discretion in such order as it deems best, call in Class 'B' and Class 'C' shares and redeem and cancel same by paying therefor the amount to the credit of such respective shares."

"Article 5. Each member shall be entitled to cast one vote, and one additional vote for each One Hundred ($100.00) Dollars paid on shares, at any and all meetings and elections. In the event any member does not attend and vote in person in any election, or meeting of the members, the Secretary is specifically authorized and may cast the vote of such member."

A like provision is shown in article 881a—54, Vernon's Ann.Civ. Statutes.

Article 860, Vernon's Annotated Civil Statutes, reads as follows: "By the term 'withdrawal value' as used herein is meant: The then value of the stock at the time indicated in the connection in which the words are used, less the lawful charges against such shares in favor of the corporation."

Miss Graham instituted this suit against both associations, alleging the transfer of assets by the Continental to the Metropolitan and the proceedings leading up thereto. She alleged in her petition that she consented to the proposed plan and assented to the contract of sale by the Continental, surrendered to the Metropolitan her certificate No. 851 of capital stock in the Continental, and in lieu thereof accepted certificates of stock in both associations and $71.91 in cash, in accordance with the terms of the contract of sale by the Continental to the Metropolitan. She further alleged that she tendered to the defendants her certificate No. 1697 for permanent shares in the Continental and demanded certificates of stock in the two associations on an equal basis and with the same rights as she had received for her certificate No. 851, which demand was refused. That demand was based on allegations that her permanent stock was of the par value of $2,000, and that the carrying out of the proposed plan as evidenced by the contract would exclude such permanent stock from participation in any of the assets and would amount to a confiscation of such shares.

Her petition concluded with a prayer for a decree establishing her right to a certificate of the capital stock in the Metropolitan for the face value of $1,275, which she alleged was the withdrawal value of her certificate No. 851, plus accrued interest, and for $2,000, the face value of her certificate No. 1697 for permanent stock.

She further alleged that the plan of operation that was adopted by the shareholders was prepared by counsel and auditors with the view and express purpose of concealing from the holders of the permanent stock the true purposes and conditions of the plan, and "that such counsel and auditors so framed and worded such plan that same is misleading, confusing and intentionally designed to lead the holders of certificates of permanent stock of said Association to believe that they would be entitled to participate in the consummation of the plan by being given equal rights with all other investing shareholders of the defendant, Continental Southland Savings & Loan Association. That as a result of such conspiracy and collusion on the part of the duly authorized counsel and auditors of the defendant, Continental Southland Savings & Loan Association, and the ingenious form in which said plan was formulated, this plaintiff was led to believe, and did believe, because of the statements contained in said plan and explanatory statement hereinabove referred to as Exhibits A and B, that she would participate in said plan in respect

of her shares of permanent stock on the same basis as any other investing shareholder of said Association."

There was a further allegation that the officers of the two associations were the same persons.

More than 200 other members of the Continental Association holding certificates of permanent shares in that association filed pleas of intervention, seeking the same relief sought by the plaintiff, and adopting the allegations of her petition on which her claim was founded. The minutes of the meeting of the shareholders recite that votes of those interveners were cast in favor of adopting the proposed plan, and no testimony is cited by appellant controverting that recital.

A general demurrer and numerous special exceptions were addressed to the pleadings of plaintiff and interveners, but the court reserved ruling thereon until the conclusion of the evidence. After hearing the evidence, judgment was rendered denying plaintiff and interveners the relief prayed for by them "without prejudice, however, to the rights of the plaintiff, the above mentioned interveners, and all owners and holders of such permanent stock to receive their pro rata distribution out of the assets remaining in the Continental Southland Savings & Loan Association, after the payment of the full book value, including the fifteen (15%) per cent write-down of all other classes of investors' stock, as contemplated and provided in the plan of liquidation of Continental Southland Savings & Loan Association and/or reorganization approved by shareholders, directors and officers and the Banking Commissioner of the State of Texas, all as set forth in the contract executed by and between Continental Southland Savings & Loan Association, under date of April 8, 1932; that as and when such final distribution is made, as above set forth, then the balance remaining to be paid to permanent shareholders."

This appeal is prosecuted by the plaintiff and interveners.

The proceeding taken was not for the purpose of liquidating and dissolving the Continental, within the meaning of article 881a—55, nor was it a proceeding by the Banking Commissioner to force a liquidation, under the provisions of articles 867, 868, 869, and 870, Vernon's Ann.Civ.Statutes. Nor was it a proceeding for consolidation of the Continental with some other building and loan association, within the meaning of article 881a—54. But it was a proceeding to transfer its assets to another building and loan association within the provisions of the last noted article.

The evidence showed conclusively that, before proceeding with the plan, the Continental had ceased to function as a solvent or going concern, and had ceased to carry out the purposes for which it was created, in that it had ceased to make loans, sell new stock, pay dividends, or even to accept withdrawal notices. Its assets were depreciating in value; 50 per cent. of its members had filed withdrawal notices; its loans were not being repaid, because of its insolvency borrowing members had refused to pay their loans, and the Banking Commissioner was threatening to place it in receivership. The board of directors of the Continental, with the advice and assistance of the Banking Commissioner, had been attempting for more than a year to work out some plan to relieve its embarrassment. One of the attempts so made is reflected by its acceptance of the proposal by Maco Stewart, which was condemned in the opinion of Justice Critz in Connally v. Continental Southland Savings & Loan Association, noted above.

The legal purport of this suit was to cancel the agreement of the stockholders of the Continental and the contract between the Continental and the Metropolitan pursuant thereto, on the ground of fraud. The allegations of fraud have been copied above. Those allegations of fraud were conclusively refuted and overcome by undisputed testimony showing that the proposed plan was prepared by the association's general counsel and certified public accountants, with the assistance of counsel and advice of the Banking Commissioner and his attorney, Judge Goodwin; that the proposal itself, together with all letters and contracts, were submitted to and approved by the Banking Department and its attorneys before mailing to the shareholders, and before such mailing that proposal was further submitted to the board of directors and presidents of several large banks in Dallas, and a group of the shareholders and approved by them.

■ Nor did appellant, Miss Rena M. Graham, offer to return the stock certificates and money she had received in exchange for her certificate No. 851, surrendered to the Metropolitan, as a condition precedent to her right of rescission. Nor

was there any pleading or evidence to show that the withdrawal value of that stock certificate was $1,027.28, as alleged by her, when determined in accordance with the provisions of article 7 of the by-laws of the Continental; nor that she had given the notice of withdrawal therein required. Furthermore, her election to retain what she had voluntarily received as the proceeds of that stock, in the absence of any fraud practiced to induce such action on her part, would amount to an estoppel to now claim that she was entitled to credit for more than what she had received.

The "write-down" of 15 per cent. of the liabilities of the Continental to its stockholders, recited above, was by virtue of the provisions of article 881a—56 reading as follows: "Whenever the losses of any building and loan association, resulting from depreciation in value of its securities or otherwise, exceed its contingent reserve fund, undivided profits and current earnings, so that the estimated value of its assets is less than the total amount due its members, the Banking Commissioner of Texas upon petition of such building and loan association, may order a reduction of its liability to its members, except upon juvenile shares, in such manner as to distribute the loss equitably among such members. If thereafter, such association shall realize from such assets a greater amount than was fixed in the order of reduction, such excess shall be divided among members whose credits were so reduced, but to the extent of such reduction only."

Those provisions of the statutes clearly show that the "write-down" of liabilities by the directors of the Continental could not be construed as a discharge of the association's liabilities to its stockholders, in whole or in part. That action had the effect only of suspending liabilities to the extent of 15 per cent. for the time being, in order to partially restore solvency of the association. As shown by the plan adopted by the shareholders, the holders of permanent stock would participate in any residue for funds collected by both associations after all other stockholders had been fully paid, and it was expressly stipulated in the by-laws of the Continental that the permanent stock could not be withdrawn until after all liabilities of the association had been satisfied in full, including the full book value of all other classes of stock. And, according to the pleadings of appellants, their permanent stock has not been surrendered but is still held by them, with

the right to such participation in the contingency provided for.

It is our conclusion that the proceedings by the Continental, recited above, were warranted by the provisions of that portion of article 881a—54, permitting the transfer of its "engagements, funds and property" to another building and loan association.

The assent of plaintiff and interveners to the plan adopted at the meeting of the shareholders estopped them from seeking the relief sought in this suit, and the action of the plaintiff in accepting stock in lieu of her stock certificate No. 851, surrendered to the Metropolitan, was a further ground of estoppel against her. Fletcher on Corporations, vol. 7, p. 8521, par. 4901, p. 8523, par. 4903, and authorities cited in support of the text; Ecker v. Kentucky Refining Co., 144 Ky. 264, 138 S.W. 264; Symmes v. Union Trust Company of New York (C.C.) 60 F. 830; Rabe v. Dunlap, 51 N.J.Eq. 40, 25 A. 959, 962.

It cannot be said that the plan adopted in accordance with the provisions of article 881a—54 would have the effect of impairing the rights of holders of permanent stock theretofore existing, and was therefore violative of the constitutional rights of holders, since under the by-laws of the Continental such stock could participate in the residue only, after the liquidation of all other stock, and they had the same rights under the plan that was adopted.

Nor was there pleading or proof that the two associations are failing to carry out the plan of operations adopted in the meeting of the shareholders.

For the reasons noted, all assignments of error are overruled and the judgment of the trial court is affirmed.

## On Motion for Rehearing.

In our original opinion we made this statement with reference to the organization of the Metropolitan Association: "Apparently that proceeding was under the provisions of article 881a—21a, Vernon's Annotated Texas Civil Statutes." Appellants call attention to the fact that that article did not go into effect until September, 20, 1932, which was twelve days subsequent to the reorganization occurring on September 8, 1932. Accordingly, that statement in the opinion is withdrawn.

We quote from the original opinion as follows: "The minutes of the meeting of the shareholders recite that votes of those interveners were cast in favor of adopting the proposed plan, and no testimony is cited by appellant controverting that recital."

The announcement that no testimony was cited by appellants controverting that recital is challenged, and in the interest of entire accuracy we will say that, while the minutes so recite, it further appears that some of the appellants were present and did cast their votes, but others were not present and affirmative votes were cast for them by the secretary, in accordance with the authority therefor given in the by-laws of the Association.

In order to meet several other complaints of inaccuracy in the opinion in which an attempt was made to give the substance of the contract of reorganization between the Continental Association and the Metropolitan Association, we will here quote from the contract itself as found in the statement of facts:

"I. For and in consideration of the sum of One Hundred ($100.00) Dollars cash in hand paid each to the other, the receipt whereof is hereby acknowledged and confessed, and the mutual advantages flowing each to the other, the said Associations do severally agree, bind and obligate themselves to do and perform each and every covenant, stipulation and prerequisite condition as hereinafter specifically set forth.

"II. The said Continental Association agrees, binds and obligates itself to transfer and assign, and to secure the transfer and assignment of its engagements, funds and properties, aggregating Four Million Thirty-five Thousand Two Hundred and Fifteen and 83/100 ($4,035,215.83) Dollars, as fully set forth and described in Exhibit 'A' hereto attached, the same as if fully written and described herein, to the Metropolitan Association.

"III. The said Continental Association further agrees, binds and obligates itself to guarantee and hold harmless the said Metropolitan Association from any loss accruing or occurring by, through or under any claim, debt or demand, now or hereafter arising or accruing against such engagements, funds and properties so assigned, as well as any losses that may occur by and through any suits now pending or that may hereafter be brought, debts, claims or demands affecting the engagements, funds and properties so assigned, including all costs, expenses and attorneys' fees, and to secure the Metropolitan Association in such guarantee by a second lien upon all of the remaining assets, reserves and earnings of said Continental Association.

"IV. The Continental Association further agrees to execute and deliver to the Metropolitan Association its certain Deed of Trust First Mortgage Note of even date with said transfer, in the principal sum of One Million Eight Hundred Fourteen Thousand Eight Hundred and Forty Nine and 85/100 ($1,814,849.85) Dollars due and payable on or before five years after date, to the order of Metropolitan Building & Loan Association, bearing interest at the rate of six (6%) per cent per annum, payable monthly, both principal and interest payable at the offices of the Metropolitan Building & Loan Association in Dallas, Texas, as and when conversions of assets into cash justify partial payments, but in any event, in five equal installments, the first installment of one-fifth being due and payable on or before the 8th day of September, 1933, and one installment of one-fifth, to become due and payable on or before the 8th day of September, 1934, and one installment of one-fifth to become due and payable on or before the 8th day of each succeeding September thereafter until the whole principal sum is paid; and all past due interest shall bear interest from maturity at the rate of ten (10%) per cent per annum; and secured by Deed of Trust constituting a first lien upon all the remaining assets, reserves and earnings of the Continental Southland Savings & Loan Association, other than those transferred to Metropolitan Association, and providing for accelerated maturity and attorney's fees; such Deed of Trust to carry all the usual terms and conditions as to insurance, taxes, and other like covenants.

"V. The Continental Association further agrees to execute and deliver to the Transfer Agent, its several drafts and/or checks, drawn in favor of its respective shareholders for the sum and in the amount of their respective cash dividend payments, provided for in the plan of August 10, 1932, at $7.00 per $100.00 paid in on said stock, for early distribution, to be delivered to such shareholders as and when/their old stock is delivered for cancellation, and to further deliver to such Transfer Agent either its new certificates in lieu thereof, or its certificates and the certificates of the Metropolitan Association, dependent upon whether such shareholders accept under the pro-

posed plan or whether they remain as shareholders solely in the Continental Association, all as hereinafter fully provided, and to assist in every way such Transfer Agent in effecting, as speedily as possible, the consummation of the plan.

"VI. The Continental Association further agreed that in the event any shareholder or shareholders of the Continental Association should fail or refuse to submit their stock for transfer, thereby failing and refusing to accept the Metropolitan Building & Loan Association stock and the terms of the proposal plan mailed to all stockholders of record of said Continental Association on August 10, 1932, on or before September 1, 1933, that in each and all of such cases the Metropolitan Building & Loan Association shall cancel any such undelivered stock and credit the amount thereof on the note above described, provided, however, that all stockholders of the Continental Association as of September 1, 1932, to whom the Metropolitan issues its stock shall be entitled to and shall receive any dividends declared on the Metropolitan stock so issued to them, until they have specifically refused to accept such stock.

"Should any stockholder or stockholders of the Continental Association as of September 1, 1932, specifically refuse to accept such Metropolitan stock, then and in that event, dividends declared on the Metropolitan stock so refused, shall be either paid to the Continental Association or applied as a credit on the above mentioned note, as determined by the Board of Directors of said Metropolitan Association.

"Should any shareholder of the Continental refuse to accept stock in the Metropolitan Association, as outlined in plan of August 10, and as per copy attached and marked Exhibit 'B' for identification, then said shareholder shall participate in distribution made to shareholders from the proceeds of assets converted into cash on the basis of the write-down value of his shares, less the cash dividend paid, as herein provided, as compared with the $14.25 interest in said shares, after payment of dividend and write-down to shareholders accepting said plan. In such wise all payments to Continental shareholders shall be equally pro rated and neither accepting nor refusing shareholders enabled to receive a preference, but to share and share alike.

"VII. The Metropolitan Association agreed to accept the above assets and note and to issue its Class 'A' stock therefor in the amount of Three Million Nine Hundred Forty-five Thousand Two Hundred Fifteen and 83/100 ($3,945,215.83) Dollars, which said stock shall be issued to each of the members of the Continental Association as of September 1, 1932, who do not refuse to accept same, and show credit as payments thereon, to the extent of $63.75 per each $100.00 book value of stock owned in the Continental Association before the 15% write-down in the stock liability has been applied, as ordered by the Banking Commissioner of Texas, on September 1, 1932, the $63.75 being the exact and proper proportion which the assets purchased and the note received by the Metropolitan Association, less reserve for dividends from July 1, 1932, to September 1, 1932, and other necessary reserves aggregating Ninety Thousand ($90,000.00) Dollars, bears to the book value of the stock held by such Continental Association shareholders. Should any Continental Association shareholder refuse to accept such Metropolitan stock and the terms of the proposal mailed on August 10, 1932, then an amount representing the proportion at the rate of $63.75 per $100.00 of the cash payments on such shares before the 15% write-down of stock liability of any and all of such shares so refused, shall be applied as a credit on the principal on the above mentioned note.

"VIII. The Dallas Bank & Trust Company of Dallas, Texas, shall be appointed Transfer Agent for all purposes contemplated under the plan and/or under this contract, and the Continental Association shall forthwith deliver to such Transfer Agent check for the cash payment and its new certificate, per copy attached and marked Exhibit 'C' for identification, reflecting the remaining interest of each Continental Association shareholder in its Association, and the Metropolitan Association shall deliver to such Transfer Agent the stock in the Metropolitan Association, all as provided for in the call of shareholders and plan submitted, dated August 10, 1932, and under this contract, so that each Continental Association member shall receive the following amounts upon each $100.00 withdrawal value of stock in the Continental Association before the division or the write-down of the Continental Association stock accounts of both investor and borrower, as ordered by the Banking Commissioner. To illustrate—

"$7.00 cash;

"$63.75 Stock in Metropolitan Building & Loan Association;

"$14.25 Stock in the Continental South-Land Savings & Loan Ass'n;

"$15.00 participation interest in the reserve of the Continental Southland Savings & Loan Association.

"The $15.00 participation interest in the reserve mentioned above is to be included in the stock certificate of $14.25. The Metropolitan Association will also deliver to the Bank Signature cards to be signed by each shareholder accepting stock. The Metropolitan Association shall also deliver to the Transfer Agent printed copies of its By-Laws, one of which shall be delivered to each shareholder accepting the cash and stock, and who signs the signature card, all the above to be delivered to the shareholder only upon proper endorsement and delivery of the stock now outstanding in the Continental Association.

"IX. The Continental Association further agrees that its assets, reserves and earnings shall and will be distributed to its shareholders on and after the full consummation of this transfer and assignment, in the following mode and manner:

"(a) To the payment of all ordinary and necessary expenses of operation and maintenance, including repairs, insurance and taxes on all properties owned, as well as the setting aside of all necessary and/or legal reserves;

"(b) To the payment of the above described note;

"(c) To the payment, or thru deposits or reserves set aside in a special account therefor, to the satisfaction of any debts, claims, demands; suits or judgments under the guarantee to the Metropolitan Association, including all expense, court costs, charges, impositions and attorney's fees; ·

"(d) Ratably to its shareholders, so that they may share and share alike until such shareholders, including investors and borrowers, shall receive par value on their stock prior to the write-down, subject to the terms herein set forth relative to shareholders who refuse to accept under the plan of August 10, 1932, and of the provisions of this contract.

"(e) Ratably to permanent stockholders.

"X. The Continental Association specially agrees, binds and obligates itself to take up all stock loans affected by the transfer and assignment, by charging same to the credit balances paid in on shares by said borrowers, and further specially agrees to pay cash as and when required for dividends to be paid out by the Metropolitan Association from July 1, 1932, to September 1, 1932, on all re-issued shares represented by Class 'A' stock under this contract.

"XI. The said Continental Association specially recognizes, acknowledges and guarantees that this contract is entered into upon the express representation by the said Continental Association through its officers and directors, that there are no unknown or undisclosed liabilities as to the assets transferred hereunder, and that all liabilities are supported by proper bona fide assets to be verified by audit if requested or necessity requires, otherwise, sufficient additional assets will be likewise transferred to cover any shortage so obtaining."

Any statements in our original opinion which are not in accord with the terms of that contract are hereby withdrawn.

Giving full force and effect to the terms of that contract as copied, we perceive no reason why our original judgment should be disturbed, and therefore appellants' motion for rehearing is overruled.